## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>R. SUSAN WOODS,<br><br>            Debtor | Chapter 7<br>Case No. 18-30549-EDK |
| R. SUSAN WOODS,<br><br>            Plaintiff<br><br>v.<br><br>ALINAS REAL ESTATE, LLC,<br>MARTIN AMAYA BARRAZA,<br>and MARTIZA BRANCHE,<br><br>            Defendants | Adversary Proceeding<br>No. 18-3019 |

### **MEMORANDUM OF DECISION**

Before the Court after trial are the "Petitioner's First Request for Restitution and Expenses Associated with Restoration to her Home, and Her Furnishings, and Belongings Thereto" (the "Restitution Motion") and a complaint seeking damages for a willful violation of the automatic stay, both filed by R. Susan Woods, the debtor in the underlying Chapter 7 bankruptcy case (the "Debtor"). The defendants, Alinas Real Estate, LLC, Martin Amaya Barraza, and Martiza Branche ("Alinas", "Barraza," "Branche," and together, the "Defendants") concede that they willfully

1

violated the automatic stay within the meaning of 11 U.S.C. § 362(k).[1] The only issue before the Court is the amount of damages sustained by the Debtor on account of that violation.

I.  FACTS AND POSITIONS OF THE PARTIES

The Debtor commenced the underlying bankruptcy case by filing a voluntary petition under Chapter 7 on July 10, 2018. At the time of filing, the Debtor resided at 43 West Street in Hadley, Massachusetts (the "Property"). Prepetition, in May 2017, Alinas purchased the Property at a foreclosure sale. In June 2018, the state housing court issued an execution for possession, and an eviction was scheduled for July 11, 2018. Notwithstanding having notice of the bankruptcy case, filed the day before, the Defendants went forward with the eviction, removed the Debtor from the Property, and removed a majority of the Debtor's personal property and placed it in storage.

On July 12, 2018, the Debtor commenced this adversary proceeding, seeking possession of the Property, a return of her personal belongings, and damages on account of the eviction. After an emergency hearing held July 13, 2018, the Defendants were ordered to immediately return possession of the Property and the personal property to the Debtor, leaving the question of what, if any, damages were recoverable for later determination. That same day, July 13, the Defendants provided the Debtor with keys to the new locks at the Property and instructed A to Z Movers ("A to Z") to return the personal property that had been removed and was then being stored at A to Z's facilities. However, at the Debtor's instruction, the personal property was not returned.

Thereafter, on July 17, 2018, Alinas filed an emergency motion seeking relief from the automatic stay imposed by 11 U.S.C. § 362(a) to proceed with a second eviction. The Debtor attempted to defend against relief from the automatic stay by attacking the validity of the

---

[1] All references to statutory sections are to provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or the "Code"), unless otherwise stated.

2

underlying foreclosure sale and the Defendant's right to proceed with the eviction under state law. Finding that the Court could not consider the Debtor's arguments under principles of res judicata, collateral estoppel, and the *Rooker-Feldman* doctrine, the Court granted relief from the automatic stay and the Defendants conducted a second eviction of the Debtor on August 9, 2018.

In the interim, on July 18, 2020, the Debtor filed the Restitution Motion, seeking restitution and expenses related to the July 11 eviction. Because the Restitution sought relief either related to or duplicative of that sought in the complaint, the motion was consolidated for trial with the adversary proceeding. In the complaint, the Restitution Motion, and her pretrial memorandum, the Debtor claims a variety of damages allegedly incurred as a result of the July 11 eviction and violation of the automatic stay. Her most recent assertion of damages, attached as an exhibit to her pretrial memorandum but not admitted into evidence at trial, estimates the total damages as exceeding $130,000.

The Defendants argue that the Debtor (1) cannot prove significant damages on account of the stay violation, (2) cannot demonstrate the requisite causal connection between alleged emotional stress and the stay violation, (3) is not entitled to punitive damages, as the Defendants acted on advice of counsel that the automatic stay did not apply, and (4) must offset any damage award against the Defendants' statutorily allowed eviction costs.

II.    DISCUSSION

The Defendants concede that they had notice of the Debtor's bankruptcy filing and, citing good faith reliance on advice of counsel, went forward with the July 11 eviction, resulting in a willful violation of the automatic stay pursuant to § 362(k), entitling the Debtor to actual damages on account of the violation, and possibly exposing the Defendants to punitive damages. *See* 11

3

U.S.C. § 362(k) ("an individual injured by any willful violation of a stay provided by this section shall recover actual damages . . . and, in appropriate circumstances, may recover punitive damages."); *Varela v. Ocasio (In re Ocasio)*, 272 B.R. 815, 824 (B.A.P. 1st Cir. 2002) (First Circuit test for willful stay violation is whether creditor had knowledge of the automatic stay and intended the act that constituted a violation of the stay).

A.  Actual Damages

Once a willful violation of the stay is established, "[t]he burden is on the debtor to prove by a preponderance of the evidence that she suffered damages as a result of the stay violation." *Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 404-05 (B.A.P. 1st Cir. 2004). Despite the lengthy list of alleged damages contained in the Debtor's pretrial memorandum, the Debtor only testified to and offered documentary evidence of the following alleged damages: (1) costs of storage for items not removed from the Property; (2) costs for packing and moving; (3) estimated costs for repair of the Property; (4) damage to personal belongings as a result of long term storage; (5) costs for office space rental and internet; (6) loss of her beehives; (7) loss of income as a beehive extractor; (8) the cost for a massage received in February 2019; (9) costs for cleaning the Property; (10) loss of her chickens; and (11) emotional distress.

1. **Storage Costs**

According to the Debtor, after the July 11 eviction and the removal of much of her personal property, some of her personal effects remained at the Property posteviction. The Debtor entered into evidence a payment receipt for Stuff it Storage which reflects a monthly charge of approximately $135 for storage of certain personal items, Pl. Ex. 1, as well as an invoice for storage space at Goodman Farm to store chicken coops and beekeeping and farming equipment, Pl. Ex. 2. The Debtor did not explain why those storage fees were incurred as the result of the July 11

4

eviction, and was unable to recall if the storage unit was rented after the first or second eviction. Trial Tr. 70:16-19. In her complaint, the Debtor (rightfully) asks that her belongings be *returned* to her possession. Those items not removed from the Property on July 11 were restored to the Debtor's possession on July 13, when the Debtor received keys to the Property. The costs related to her later storage of those items are not connected to the violation of the automatic stay.

### 2. Packing and Moving Costs

The Debtor submitted invoices for packing and moving services incurred in moving chicken coops and other personal items. Pl. Ex. 2, 3. As with the storage costs, the Debtor has failed to explain how the costs of packing and removal of personal items from the Property is compensable as a result of the stay violation. The fact that the Debtor was later required to remove her personal property as the result of the inevitable second eviction is not a damage caused by the July 11 eviction.

### 3. Repair Costs

The Debtor introduced into evidence an estimate for repairs to the Property she says were necessitated because of damage to the Property that occurred during the July 11 eviction. Pl. Ex. 4. The Debtor conceded, however, that the repairs were never performed. Trial Tr. 79:22-24. As the Debtor did not then and does not now own the Property and no longer resides there, the Defendants are not liable for the costs of any repairs on account of damage to the Property – property which they themselves own.

### 4. Damage to Personal Property

The Debtor testified that she was seeking damages for degradation of her personal belongings as a result of them having been in storage for over a year. However, the Debtor also testified that it was she who instructed A to Z not to return her personal belongings on July 14,

5

only 3 days after the eviction. Trial Tr. 68:15-20. She further testified that she had not gone to check on any of her personal property in storage with A to Z, Trial Tr. 61:5-18; 124:11-13, and presented no credible evidence of damage to her personal property as a result of the July 11 eviction.

### 5. Office Rental and Internet

The Debtor introduced into evidence an invoice that includes charges for "office space rental + internet." Pl. Ex. 2. The Debtor did not testify as to when the office space was rented and how such rental costs were incurred as a result of the Defendants' automatic stay violation.

### 6. Beehives

The Debtor testified at length regarding the loss of her beehives that she attributes to the Defendants' stay violation. At the time of the July 11 eviction, the beehives were not located at the Property, but in a nearby town. Trial Tr. 73:12-18; 80:5-11. However, the Debtor asserted that her beehives collapsed when she was unable to care for the bees as the result of a broken foot incurred while she was living in a tent in unfamiliar surroundings following the July 11 eviction. Trial Tr. 80:12-21. The Court notes that no evidence of the broken foot was introduced, but even if true, the Court cannot find that the Debtor suffered the injury as the result of the automatic stay violation. The Debtor testified that she broke her foot on July 27, 2018, a full two weeks after the Debtor was restored to the Property. Trial Tr. 40:16-19; 81:9-10. While the Debtor has alleged that the Property was unlivable after the eviction, Trial Tr. 75:14-21, the Court did not find that testimony credible.

While the Court finds logical the assertion that the eviction left the Property in a state of disarray, the Court found the testimony of Ben Zeller ("Zeller"), vice president and employee of A to Z who was present at the July 11 eviction, to be credible. Zeller testified that the first floor

of the Property was not in good condition as a result of having been partially open to the elements for what appeared to have been a prolonged time. Trial Tr. 88:14-18. However, he also testified that the second floor was in livable condition. Trial Tr. 88:18-19; 108:18-20. The Debtor did not support her contention that the Property was completely uninhabitable on July 13, when possession was restored to her. Accordingly, the Court concludes that the Debtor's broken foot, incurred as a result of living in unfamiliar surroundings at a time when possession of the Property had been restored to her, and any consequences resulting from that injury, were not causally connected to the Defendants' violation of the automatic stay.

### 7. Massage

The Debtor claims that she received a massage in February 2019 to alleviate back pain that resulted from a change in gait due to her broken foot. Pl. Ex. 5, Trial Tr. 24:24-25; 80:2-4. Because the injury was incurred after the Debtor was restored to the Property, the cost of the massage is not compensable as a damage incurred on account of the stay violation.

### 8. Cleaning Costs

The Debtor submitted into evidence two invoices which include charges for cleaning the Property following the July 11 eviction. While the Court is not persuaded that the Property was left uninhabitable as the result of the eviction, the Court does find credible and logical that the Property was left in a state of some disarray. Accordingly, the Court will award the reasonable documented costs for cleaning the Property posteviction. The first invoice, from Groundwater Home Services, dated August 6, 2018, recites a flat fee for "Packing, Moving and Cleaning" in the amount of $4,000. The invoice does not specify which portion of the charge was for cleaning the Property. Pl. Ex. 2. The second invoice, for services performed by Matured Space, includes a $420 charge for cleaning the Property between July 28 and 31, 2018. The Court finds and rules

that the Debtor is entitled to compensation of $420 on account of cleaning services performed after the July 11 eviction.

### 9. Loss of Income as Beehive Extractor

According to the Debtor, prior to the July 11 eviction, she had occasionally worked extracting feral beehives from others' property. Trial. Tr. 123:6-13. The Debtor alleged that she has been unable to work in that capacity as the result of her tools being put in storage following the eviction. Trial Tr. 123:13-24. She further testified that A to Z informed her that she would have only a one-time access to her personal belongings, an insufficient time to find needed items. Trial Tr. 124:2-10. However, as noted earlier, A to Z was prepared to return all of the Debtor's personal belongings to the Property on July 14, which the Debtor refused. Having been granted the opportunity to retake possession of the personal property, the Court finds that the Debtor's alleged subsequent inability to access her tools was not caused by the stay violation.

### 10. Chickens

The Debtor testified that, as of July 11, 2018, she owned a flock of approximately 20 chickens, Trial Tr. 69:8-10, which, on average, produced a dozen and a half eggs daily, Trial Tr. 70:4-6. She allowed local farmers to sell the eggs and received various foodstuffs in exchange. Trial Tr. 39:6-11; 40:1-2. According to the Debtor, on July 11, she was denied the ability to take the chicken coops from the Property, Trial Tr. 47:10-11; 57:23-58:1, and was forced to relocate the chickens to a local farm where they did not have access to safe sleeping quarters. As a result, the Debtor says, several of the chickens were killed, Trial Tr. 47:23-24, and, ultimately, the Debtor chose to donate the flock to an animal sanctuary. Trial Tr. 47:25-48:1. Although the Debtor did not testify directly at trial as to the number of chickens lost between July 11 and July 13, when the Debtor was allowed access to the Property, the Court takes judicial notice of the Debtor's

representations in her "Motion to Allow Petitioner to Donate her Flock of Chickens to an Animal Sanctuary," filed in the main case on July 23, 2018, *see* 18-30549, ECF No. 38, in which the Debtor represented that, at that time, four of the chickens had died following the July 11 eviction. In that motion, the Debtor also represented that that the chickens' monetary value was, at most, between $15 and $25 in the specialty farming market.

At trial, the Debtor asserted that the entire flock and her breeding program were lost as result of the eviction, but did not adequately explain why she was unable to return her flock to the coops located at the Property when possession was restored two days later. Instead, the Debtor chose to seek authority to donate the flock to an animal sanctuary. Accordingly, the Debtor's loss of the entire flock resulted from her own decision to ultimately donate the animals. At most, the Debtor has asserted a credible claim for the loss of 4 of her chickens as a result of the stay violation. Using the Debtor's own estimate of the monetary value of the chickens, the Court will award damages in the amount of $20 dollars for each chicken lost, for a total of $80.

### 11. Emotional Distress

The Debtor testified that she experienced emotional distress as a result of the July 11 eviction. Much of the Debtor's testimony focused on the long term mental health consequences that resulted from the Debtor's homelessness following both the first and second evictions, and the Debtor largely failed to parse out emotional damages specifically caused by the first eviction and the stay violation.[2] The Debtor did credibly testify that, having filed the underlying bankruptcy case with the expectation that the scheduled July 11 eviction would not go forward in light of the automatic stay, Trial Tr. 45:3-5, she was "very shaken . . . feeling extremely vulnerable and abused

---

[2] The Court notes that the Debtor has repeatedly alleged that she has been homeless from the July 11 eviction through the present. However, as discussed earlier, the Debtor has not adequately explained why she chose not to return to the Property after possession was restored to her on July 13.

9

. . . and . . . nauseous and weak" when the eviction went forward, Trial Tr. 47:1-5. The Debtor claimed that, despite her outward stoicism, she experienced fear, anxiety, and anger, Trial Tr. 48:9-10, and experienced nightmares that evening, waking "in a cold sweat from the distress," Trial Tr. 48:20-24.

In the First Circuit, it is axiomatic that "emotional damages qualify as 'actual damages'" under § 362(k), and that, in appropriate circumstances, "[a]n honest accounting of actual damages . . . must include the psychological suffering." *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d 265, 269-70 (1st Cir. 1999). Proof of medical treatment for emotional distress caused by a stay violation may bolster a claim for damages. *See e.g., Curtis v. LaSalle Nat'l Bank (In re Curtis),* 322 B.R. 470, 486 (Bankr. D. Mass. 2005) (emotional distress damage award upheld where debtor credibly testified to stress, weight loss, and vomiting, as well medical treatment with anti-depressant medication). But no particular quantum of evidence or proof of medical treatment or diagnosis is required in order to recover emotional distress damages. *See, e.g. Kaneb*, 196 F.3d at 269 (citing *In re Carrigan*, 109 B.R. 167, 170 (Bankr. N. C. 1989) for the proposition that emotional distress injury may be "somewhat imprecise, but it is real"); *Bererhout v. City of Malden (In re Bererhout)*, 2011 WL 2119007, *8 (Bankr. D. Mass. May 24, 2011) (emotional distress damages of $1,000 awarded based on credible testimony, even though no detailed evidence presented to quantify damage amount); *In re Barry*, 330 B.R. 28, 38 (Bankr. D. Mass. 2005) (emotional distress damages of $5,000 awarded based on credible testimony regarding stress and loss of sleep caused by stay violation); *In re Rosa*, 313 B.R. 1, 7 (Bankr. D. Mass. 2004) (emotional distress damages of $4,000 awarded based on credible testimony regarding "emotional upset and lack of appetite and sleep").

Here, the Court believes the Debtor experienced anxiety, anger, fear, nausea, and disturbed sleep as a direct result of the July 11 eviction – an eviction which the Debtor had believed

10

(correctly) should have been stayed by the bankruptcy filing. While the Court finds that much of the Debtor's ongoing emotional and mental distress has resulted not from the stay violation, but from the subsequent lawful eviction, the Court finds that the Debtor suffered emotional distress in the immediate aftermath, and as a direct result, of the stay violation, justifying a damage award for emotional distress in the amount of $1,000.

B. Punitive Damages

While § 362(k) allows for an award of punitive damages in "appropriate circumstances," the Code "does not attempt to delineate further what this means." *Heghmann*, 316 B.R. at 405. The Bankruptcy Appellate Panel for the First Circuit has provided some guidance, noting several factors to be considered by the bankruptcy court in deciding whether, in its discretion, punitive damages are warranted:

> Relevant factors are: (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor.

*Id.* Considering these factors, the Court believes some award of punitive damages is appropriate in this case. Although Barraza credibly testified on behalf of the Defendants that they relied on the advice of counsel in proceeding with the July 11 eviction, Trial Tr. 118:8-19, the egregiousness of the stay violation warrants some measure of punitive damages. This is not simply a case of a creditor filing or continuing a lawsuit against a debtor or making a postpetition demand for payment. Rather, the Debtor was forcibly removed from her home and temporarily deprived of many of her personal possessions as a result of the eviction – an action that clearly ran afoul of § 362(a), which enjoins both "the commencement or continuation, including the issuance or employment of process, of . . . [an] action or proceeding . . . to recover a claim against the debtor that arose before the commencement of the case . . ." and "the enforcement, against the debtor . . .

11

of a judgment obtained before the commencement of the case." 11 U.S.C. § 362(a)(1), (2). At the hearing held on July 13, 2018 regarding the Debtor's demand that possession of the Property be returned to her, then counsel for the Defendants argued that the eviction was excepted from the stay pursuant to § 362(b)(22). To the extent counsel relied on that subsection to justify the advice to the Defendants that proceeding with the July 11 eviction was permissible, the Court finds little merit in that reliance. While that subsection applies to the continuation of certain eviction proceedings, the plain language limits its application to situations involving a debtor that "resides as a tenant under a lease or rental agreement." 11 U.S.C. § 362(b)(22). There is no question that the Debtor here did not reside at the Property pursuant to a lease or rental agreement with the Defendants.

And although the Debtor has an established history of litigiousness, has continually challenged Alinas's claim to the Property by attacking the underlying foreclosure sale, and has engaged in a relentless pursuit to regain the Property, these actions do not constitute the type of "provocation" by the Debtor that would absolve the Defendants from liability for the egregious violation of the automatic stay that occurred here. The Defendants' reliance on counsel may be relevant to a determination of the *amount* of punitive damages to be assessed, but it does not persuade the Court that none should be awarded. Given the severity of the consequences for the Debtor as a result of the stay violation, the Defendants should have been infinitely more cautious before proceeding with the July 11 eviction. "That a creditor should question the advice of its attorney may seem counterintuitive to some. But the reason for this decisional rule is a sound and simple one: '"[T]he stay is a broad provision which requires a creditor to seek a *judicial* determination of its right to proceed." It would contravene a fundamental policy of federal bankruptcy law to allow creditors to proceed with actions possibly subject to the stay merely upon

12

the advice of an *attorney* that they are entitled to proceed.'" *In re Daniels*, 316 B.R. 342 (Bankr. D. Idaho 2004) (quoting *Tsafaroff v. Taylor* (*In re Taylor* ), 884 F.2d 478, 483 (9th Cir. 1989)). "As noted above, while it seems obvious now, one prudent course for Creditor and Counsel would have been to seek a prompt judicial determination that their proposed course was the correct one." *Id.* at 352-53.  For these reasons, the Court concludes that a punitive damage award of $1,000 is appropriate in this case.

    C.  Setoff

At the conclusion of trial and in their pretrial brief, the Defendants argued that any recovery by the Debtor on account of the stay violation should be set off against the postpetition eviction costs incurred by Alinas and recoverable pursuant to a Massachusetts statute.  First, even though certain eviction costs may be recoverable pursuant to nonbankruptcy state law, the Court finds and rules that the Alinas is not entitled to charge the Debtor with the claimed $3,509 in costs incurred in connection with the July 11 eviction.  Def. Ex. 12.  In the First Circuit, actions taken in violation of the automatic stay are void.  *In re Soares*, 107 F.3d 969, 976 (1st Cir. 1997).  To allow the Defendants to recover costs associated with their actions taken in willful violation of the automatic stay would be unconscionable.

As for the postpetition costs incurred in connection with the second eviction, a total of $2,046.49, *see* Def. Ex. 13, 14, the Court takes no position as to whether those postpetition costs are recoverable in a nonbankruptcy forum.  To the extent that they are, however, the Court rules that the Defendants are not allowed to set off those costs against the stay violation damage award. In support of their request for setoff, the Defendants refer to § 553 of the Code and to general principles of Massachusetts common law.  Section 553 is not applicable, as it speaks only to setoff

rights regarding prepetition debts;[3] both the stay violation and the second eviction occurred postpetition. Furthermore, the cases cited by the Defendants are readily distinguishable and contain no reference to common law setoff rights under Massachusetts law. And even if setoff concepts conceivably apply, equitable principles preclude setoff in this case – the Defendants should not be able to avoid payment of damages incurred on account of a willful automatic stay violation by setting those damages off against an essentially unrelated debt that the Debtor may owe postpetition. *Cf. In re Harrison*, 599 B.R. 173 (Bankr. N.D. Fla. 2019) (set off of damages for violation of automatic stay against amounts owed by debtor inequitable and denied).

III. CONCLUSION

For all the foregoing reasons, the Court finds and rules that, pursuant to 11 U.S.C. § 362(k), the Defendants are liable to the Debtor in the amount of $1,500 for actual damages and $1,000 in punitive damages for their violation of the automatic stay by evicting the Debtor on July 11, 2018, to be paid within 30 days following the Court's order and judgment becoming final, said order and judgment to enter separately forthwith.

DATED: February 4, 2020

By the Court,

*Elizabeth D. Katz*

Elizabeth D. Katz
United States Bankruptcy Judge

---

[3] *See* 11 U.S.C. § 553(a) (referring to setoff rights under the Bankruptcy Code and nonbankruptcy law regarding debts that "arose before the commencement of the case").